Entered: October 4th, 2022
Signed: October 3rd, 2022



**THOMAS J. CATLIOTA**
**U.S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
## at GREENBELT

| | | |
|---|---|---|
| In re: | * | Case No.   20-10208-TJC |
| Jay B. Teston | * | Chapter   7 |
| Debtor | * | |
| *   *   *   *   *   *   * | * | |
| Janet Nesse, Chapter 7 Trustee | * | |
| Plaintiff | * | |
| vs. | * | Adversary No.  20-00141 |
| University System of Maryland | * | |
| Defendant | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

### <u>MEMORANDUM OF DECISION</u>

Janet Nesse, the Chapter 7 Trustee for the debtor Jay Teston's bankruptcy estate (the

"Trustee"), brings this fraudulent transfer action against the University of Maryland, College

Park, the Board of Regents of the University System of Maryland, and the University System of

Maryland (collectively the "University"). She contends that tuition and other payments made to

the University by the debtor on behalf of his adult son are avoidable fraudulent transfers under

11 U.S.C. §548(a)(1)(B)[1] and recoverable from the University under §550.

---

[1] Unless otherwise noted, all statutory references herein are to the Bankruptcy Code, 11 U.S.C. §§101 *et seq.*, as currently in effect.

Before the Court are cross motions for summary judgment.  The sole dispute is whether the University was the initial transferee of the payments under §550(a)(1), and therefore liable for the return of payments, or an immediate or mediate transferee of the payments under §550(a)(2), and therefore entitled to assert the good faith defense of §550(b)(1).  For the reasons that follow, the Court concludes the University was not the initial transferee of payments that the University was obligated to refund to the student upon withdrawal from the school, but was the initial transferee of payments made after the refund period expired.

## Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334, 28 U.S.C. §157(a), and Local Rule 402 of the United States District Court for the District of Maryland. This matter is a "core proceeding" under 28 U.S.C. §157(b)(2)(H) and the Court has statutory authority to enter a final order.  The parties consent to entry of a final order by this Court.  ECF 19 at ¶1.  To the extent that this matter is not constitutionally core under *Stern v. Marshall*, 564 U.S. 462 (2011), or *Sher v. JPMorgan Chase Funding Inc. (In re TMST, Inc.)*, 2015 WL 4080077 (D. Md. July 6, 2015), this Court has constitutional authority by virtue of the parties' consent.  *See Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 669 (2015).

## Stipulation of Facts

The parties stipulate to the following facts.

1.      Jay B. Teston (the "Debtor") was insolvent under the meaning of §101(32) no later than April 25, 2016, and remained insolvent at least until April 30, 2019.

2.      The University utilizes electronic billing on a monthly basis to send official notification to current and recently separated students for billable items including, but not limited to, tuition, mandatory fees, course lab fees, campus parking permits, on campus housing and dining, student

health insurance plans, and any related late fees and penalties.  Students have access to all of their current account activity, which includes transactions as they occur in between billing cycles through the online Quikpay and Testudo portals.  A student can access these portals using their individually assigned login credentials.  Viewable transactions in the portals include a current account balance, all assessed charges deposits, payments, payment plan activity, financial aid transactions, and refunds.

3.      In accordance with federal requirements under the Family Educational Rights and Privacy Act, 20 U.S.C. §1232g ("FERPA") and the University's policy, the student's account is exclusively accessible by the individual student.  As a default, the student's parent(s), legal guardians, or other interested parties have no rights to non-public information as defined by FERPA related to a student's account, including charges, credits, and balance information. Access to non-public account information is only granted with an account owner's (student) permission.  This permission is achieved by the account owner (and only the account owner) submitting a request to add an authorized user.

4.      The Terp Payment Plan is a University offered payment type to current students who are in good financial standing to help defray the costs of a term over several monthly payments. This service allows students to make monthly payments at prescribed times and amounts over the course of a semester.  The Terp Payment Plan has been functionally administered, which includes getting acceptance of the enrollment terms and conditions, and the processing of monthly payments, by a University contracted third party vendor.  The current vendor for this service is Nelnet Business Solutions Inc., but for the timeframe of this case, the vendor was Tuition Management Systems (TMS).  TMS is now owned by Nelnet Business Solutions Inc. During enrollment and acceptance to the terms and conditions, the party setting up the plan is

asked to submit banking information for which to draft the subsequent monthly scheduled payments.  A parent, guardian, or otherwise authorized party may set up a plan agreement on behalf of a student whereby all proceeds ultimately get applied to the student account just as if it were a direct payment as described in section 5 in this document.  Scheduled monthly payment withdrawals are initiated by the vendor to auto-draft from the enrolled bank account on the 5th of each month (or the next business day if the 5th falls on a weekend) to the vendor's (TMS's) account.  The plan may be cancelled, plan amount altered, or the selected funding bank changed at the plan holder or student's (if different) request.  Payments made to a Terp Payment Plan are forwarded by the vendor to the University after the funds have cleared and then the University applies the funds to the student account exactly as it would apply a direct payment.  TMS has no discretion regarding payment of said funds to the University.  This means that if a refund scenario described below occurs after some or all of a Terp Payment Plans payments have been applied to the student account, the student (not the plan holder/payor if different) would be the eligible party to receive any applicable refunds.

5.      Any payment that goes towards a student's account, such as Title IV financial aid, even if paid by a parent or other individual or entity, is treated as if it is a payment came directly from the student for purposes of 1098-T tax reporting as well as the individual party to be refunded if a refund scenario as set forth below arises.

6.      If a credit exists on a student account and no balance is due the University, a refund of the credit can be requested by the student and obtained via direct deposit or paper check.  An account credit may arise, for example, if an overpayment is made beyond what is owed, or if a University charge that was paid for is subsequently reversed by the University, or a student withdraws from some or all courses for a term during the eligible refund period of a term.  A

4

parent may not request to be paid a refund of an unencumbered credit on the student's account, even if every payment made to the account was made by the parent and the parent is an authorized party to review FERPA-protected information in the account.

7.      Prior to the start of each semester, students are notified by e-mail when their electronic billing statement or "eBill" is ready for the student and authorized party to view (if student this access has been granted) through the appropriate online portal.  Per University policy, the student may request a complete withdrawal from classes before the start of a Fall or Spring term and receive a 100% refund of assessed Tuition and Mandatory fees for that term.  A reduced percentage refund of assessed charges may also apply depending on the date a withdrawal is officially requested.  The full refund schedule for a complete withdrawal, which includes reduced percentages at later dates, can be found in the "Withdrawal and Refund of Fees" section within the official University-published catalog at:

https://academiccatalog.umd.edu/undergraduate/fees-expenses-financial-aid/explanation-fees/#text. (Note: This published data is for the 2020/2021 academic year, but the refund policy and schedule remained identical during the entire period in which student William Teston, son of the Debtor ("William"), attended the University.).  Any credits produced on a student account due to payments received or a reduction in charges as described above may be refunded to the student directly via direct deposit or paper check if no other balance is due the University.

8.      According to records of the University's Student Financial Services, William was an undergraduate student at the University from the Fall 2016 term through the Spring 2019 term. During William's tenure at the University of Maryland, he was charged $36,898.79 by the University in total for all periods he was in attendance.  For this same attendance period, the sum net total of all received funds at the University was $36,899.50.  This left a net credit on the

student account which still remains today of $0.71 cents.  This has not been refunded because it does not meet the minimum amount required under University policy to process a refund.  An accurate breakdown of all payments received by the University is submitted in the record at ECF 44.  The breakdown reflects the date of each payment, amount of each payment, whether the payment was made by credit card or ACH (an electronic bank-to-bank payment transfer system), whether the payment was made directly to the University or to the third-party payment plan vendor, and the payor of the payment.  Where payment was made to the payment plan vendor, the University received funds from the vendor.  Of the total amount paid to the University in connection with William's account, $10,103 was paid directly to the University by the Debtor, either via ACH or credit card payment.

9.      William did not ever fully withdraw from a term during the course of his education at the University.  However, during the summer 2017 session he did initially enroll in two (2) classes and later dropped one (1).  These two (2) courses were paid for on May 22, 2017, via a direct online check payment made by the Debtor.  In keeping with University policy, William received a 100% reversal of charges for the one (1) dropped course to his student account, and a subsequent refund was processed by the University on June 21, 2017, and paid to William through a mailed paper check for $1,676.

10.     The University does not investigate the source of the funds transferred into the student's account, and does not perform audits of a student's parents or any other applicable authorized user's banking data.

11.     In exchange for the funds paid to the University, the University provided William with undergraduate classes that allowed him to earn a bachelor's degree.  In May of 2019, William was awarded a bachelor's degree in Information Science by the University.

6

12.    If the transfers in the Complaint are avoided, the University is required by Maryland law to seek recovery from the student for the resulting account balance.  Recovery efforts on overdue accounts typically include putting a hold on the student's transcripts and on any future requested University services until the balance is paid in full.  In addition, the failure by the student to repay the account balance shall result in the transfer of the account for the amount then due to the Central Collection Unit of Maryland ("CCU"). If this action is taken, in addition to transcripts and University privileges being withheld, CCU may assess a fee of 17% of the principal amount due and report negatively to the credit bureaus against William's credit.  It is important to note that because the academic aid years have closed for all periods during William's tenure as a student, no financial aid or traditional educational loan sources would be available to him in assisting in repayment of any balances that would become due.

### Other Material Facts not in Dispute

In addition to the stipulated facts, the parties submitted the transcript of the deposition of Michael Oakley, the associate director of student financial services, and the University's representative under Fed. R. Civ. P. 30(b)(6), from which the following additional undisputed facts are taken.  ECF 46-2.  Payments received by students or parents for tuition and other charges are deposited in the University's bank accounts and are available for its use.  *Id.* at pp. 15-16.  There is no separate transaction between the student's University account and the school's bank account—they are the same.  *Id.*  The student "account" is "simply a visual . . . a way to show what has occurred."  *Id.* at p. 17.  It is not an individual account like a bank account. *Id.*  The University generally only accepts payments for an account that owes the school money—a student cannot deposit funds in the account without an outstanding charge.  *Id.* at p. 20.  By withdrawing from all courses before the first day of classes in a term, a student is entitled

to receive a 100% refund.  *Id.* at p. 29.  A student can receive an 80% refund if withdrawal occurs during the first five days of classes.  *Id.*  Any time after that, the student can receive no refund for tuition and mandatory fees.  *Id.*

## Conclusions of Law

The parties agree all material facts are not in dispute and the matter is appropriately resolved on summary judgment under Fed. R. Civ. P. 56, applicable here by Fed. R. Bank. P. 7056.

A trustee must avoid a transfer under §548 or other statute before recovering the transfer under §550.[2]  *See Guttman v. Construction Program Group (In re Railworks)*, 760 F.3d 398, 403 (4th Cir. 2014).  The University does not dispute that the Trustee has stated a *prima facie* claim for fraudulent transfer under §548(a)(1)(B).  The tuition payments were made while the Debtor was insolvent and the Debtor did not receive reasonably equivalent value.

Section 550(a) provides:

> to the extent that a transfer is avoided under [§548], the trustee may recover, for the benefit of the estate, the property transferred or, if the court so orders, the value of such property, from—
> (1)      the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
> (2)      any immediate or mediate transferee of such initial transferee.

§550(a).  Section 550(a) is not absolute:

> The trustee may not recover under [§550(a)(2)] from—
> (1)      a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
> (2)      any immediate or mediate good faith transferee of such transferee.

---

[2] The Trustee has raised both §548 and state law as statutory vehicles to avoid the payments.  The Trustee argues the payments are constructive fraudulent transfers under Md. Code Ann., Com. Law §§15-204 and 15-206.  Section 548 provides a two-year look back period.  §548(a)(1).  However, Maryland's three-year statute of limitations applies to transfers under state law.  For simplicity, the Court will not discuss avoidance under state law because the Court concludes that the transfers are avoidable under §548.

§550(b).  The dispute is whether the University is an "initial transferee" under §550(a)(1) or a "immediate or mediate transferee" of an initial transferee under §550(a)(2).   If the University is an initial transferee, then the Trustee may recover the payments as an avoidable transfer.  If the University is not the "initial transferee," but is an immediate or mediate transferee of an initial transferee, then the University can prevent recovery under the good faith defense.

The Bankruptcy Code does not define "initial transferee."  The "initial transferee" is not always the initial recipient.  *Huffman v. Commerce Sec. Corp. (In re Harbour)*, 845 F.2d 1254, 1257 (4th Cir. 1988).  The Fourth Circuit has adopted the dominion and control test set forth by the Seventh Circuit in *Bonded Fin. Serv., Inc. v. European Am. Bank*, 838 F.2d 890 (7th Cir. 1988).  *Bowers v. Atlanta Motor Speedway (In re Southeast Hotel Props.)*, 99 F.3d 151 (4th Cir. 1996) (hereinafter referred to as "*Bowers I*").  To be an initial transferee, one must "exercise legal dominion and control over the property" in question.  *Bowers I*, 99 F.3d at 156.  That test requires more than "physical dominion and control."  *Id.*  "[T]he minimum requirement of status as a 'transferee' is dominion over the money or asset, the right to put the money to one's purposes."  *Id.* at 154.

The Fourth Circuit applied the "legal dominion and control" test adopted in *Bowers I* to a bank's issuance of a cashier's check in *Bowers v. Kuse Enters. (In re Florida Hotel Props. Ltd.)*, 172 F.3d 43 (Table), Case No. 97-2507, Adv. No. 97-2583, 1998 WL 957455 at *1 (4th Cir. Sep. 22, 1998) (hereinafter referred to as "*Bowers II*").  There, the appointed Chapter 11 trustee brought an action under §549 to recover two unauthorized, post-petition cashier's checks used to acquire a helicopter.  *Id.*  The defendant argued that the bank issuing the cashier's checks was the initial transferee.  *Id.* at *3.  Therefore, the defendant argued, because it gave value and lacked knowledge of the voidability of the transfer, it could not be liable for recovery of the cashier's

checks as the subsequent transferee under §550(b)(1).  *Id.*  As such, the Fourth Circuit had to

examine an issuing bank's role under §550 when its customer obtains a cashier's check for

payment to a third party.  *Id.*

Relying on the rationale of *Bowers I*, the Fourth Circuit rejected the defendant's

argument and held that the bank was not the initial transferee, but a mere conduit in the

transaction.

> [T]o be an initial transferee, a party must exercise legal domain and control over
> the property—physical possession of the property is not sufficient.  Thus, a party
> acting as a "mere conduit" for the transfer of the property and who has no legal
> right to use the funds for its own purposes is not the "initial transferee" for purposes
> of §550(a).

*Id.* (citing *Bowers I*, 99 F.3d at 155).  The Fourth Circuit went on to explain that

> [a]lthough the funds were put in the Bank's possession, they were placed there
> solely to enable the Bank to issue the cashier's check to [the defendant].  The Bank
> had no right to use the funds for other purposes and therefore lacked the authority
> to exercise legal dominion and control over the funds.  Accordingly, under the
> dominion and control test adopted by this court in *Bowers I*, the Bank was not the
> "initial transferee" of the funds[.]

*Id.* at *4.  A transferee who is obligated to use funds in a particular manner is not precluded from

being the initial transferee.  *Lowery v. Security Pacific Business Credit, Inc. (In re Columbia

Data Products, Inc.)*, 892 F.2d 26, 27-28 (4th Cir. 1989) (holding a creditor to be the initial

transferee where the creditor, pursuant to an agreement, was obligated to deposit payments from

the debtor into an account for the purpose of satisfying debts of the creditor).

Many courts have addressed the question of whether a parent's payment of an adult

child's college tuition is a fraudulent transfer.  Most cases have considered whether a debtor

receives reasonably equivalent value in exchange for the turion payments, and therefore whether

the transfer is avoidable in the first place.  *See*, *e.g*., *DeGiacomo v. Sacred Heart University, Inc.*

*(In re Palladino)*, 942 F.3d 55, 59 (1st Cir. 2019) (No value is given by a university when the university accepts tuition payments from a parent on behalf of a student for purposes of §548(b)).

Here, however, the University stipulates that the transfers from the Debtor were fraudulent transfers under §548(a). The University's implicit stipulation that the Debtor did not receive reasonably equivalent value under §548(a)(1)(B) is not a hindrance to its good faith defense under §550(b)(1). While §548(b) requires an assessment of whether "the debtor . . . received less than a reasonably equivalent value," §550(b)(1) "looks to what the transferee gave up rather than what the debtor received." *Bonded*, 838 F.2d at 897. The Trustee does not dispute the University gave value in exchange for the payments.

Two cases, and three courts, have considered whether a university is the initial transferee or the immediate or mediate transferee of tuition payments made by a parent for an adult child. As one court has put it, in considering the issue, "timing is everything." *In re Hamadi*, 597 B.R. 67, 73 (Bankr. D. Conn. 2019).

In *Pergament v. Brooklyn Law School*, 595 B.R. 6 (E.D.N.Y. 2019), the Chapter 7 trustee sought to recover pre- and post-petition tuition payments the debtor had made for his children to two universities and a law school. According to the court, the timing of the payment is dispositive. *Id.* at 11. A number of payments were made while the school was obligated to refund them to the student upon withdrawal. Refunds were required to be made to the student, not the parent. According to the court, the school is a mere conduit of the funds received while the school was obligated to refund them to the student upon withdrawal, and the student is the initial transferee. The court applied the rationale of *Bonded* and concluded:

> [E]ven though the schools received the tuition directly from the debtor and eventually applied those payments toward his children's incurred tuition charges, the schools did not have dominion and control over the tuition payments until the children no longer had any legal right to a refund. Before then, the schools retention

> of the payments was subject to the possibility that the debtor's children would
> withdraw from school and take the money with them, and thus the schools had
> insufficient dominion and control at that point to be considered initial transferees.

*Id*.  Because the students "could have withdrawn from school and taken the money . . . to do

with as they wished," the student, not the school, exercised dominion and control over the funds.

*Id.* at 16-17.

"By the same logic," the *Pergament* court held that the schools were the initial

transferees of payments received after the student could obtain a refund because the student

could not exercise dominion and control over those payments.  *Id.* at 18.  "Once the deadline to

withdraw from school had passed, the schools were actually owed tuition[.] . . .  And once the

schools received the tuition that they were owed, it was theirs to do with as they wished[.]"  *Id*.

The court in *Hamadi* applied the same rationale and determined that the university did

not maintain dominion and control over refundable payments, and therefore the student was the

initial transferee and the school was a mere conduit.  *Hamadi,* 597 B.R. at 73.  When the

university received refundable payments, it "essentially acted as a financial institution or

intermediary . . . akin to a financial institution maintaining a bank account."  *Id*.  The court also

agreed with *Pergament* that once the refund period expired and the school no longer had an

obligation to refund the payments, "it exercised complete dominion and control over the

nonrefundable portion" of the payments.  *Id*.  The school, therefore, was the initial transferee of

nonrefundable payments.  *Id*.

Here, the University was obligated to refund 100% of payments made after registration

and before the start of the term, *i.e.*, the first day of classes.  The refund was required to be paid

to William even if the payments were made by the Debtor.  These payments were legally akin to

a deposit.  The University gave value by accepting William, allowing him to register and holding

a place for his attendance, but it had no legal right to keep the payments in the event William withdrew before the start of the term.

The rationale of *Bowers I* and *Bonded* directly applies to these payments. The University was a mere conduit for the payments and did not have legal dominion and control over the funds. William was the initial transferee because it is he who controlled the right to either receive the funds or have them applied to his tuition by beginning the term. Once William began classes and the payments could effectively be applied to tuition, the University became an "immediate or mediate transferee" of the funds entitled to assert the good faith defense of §550(b)(1). Payments made by the Debtor during this period are not recoverable from the University.

Although the answer is perhaps not quite as clear, the same is true for the refundable portion of payments made after the beginning of the term in the small window during which William would have been entitled to a partial refund upon withdrawal. According to the deposition testimony of Michael Oakley, the associate director of student financial services and the University's representative taken under Fed. R. Civ. P. 30(b)(6), once William began the term, he could have received up to an 80% refund if he withdrew during the first five days of classes. During this period, William exercised legal dominion and control over the funds to the extent he could receive a refund upon withdrawal.

Conversely, the University was the initial transferee for payments made by the Debtor after the refund period expired. At that point the University had no obligation to return the funds and held legal dominion and control over the funds. The University contends that the payments were, in effect, made first to the student who then transferred the funds to the University to pay tuition, such that the student was the initial transferee. The Court disagrees. William held no right or ability to obtain the funds after the refund period or use them for his own purpose. He

13

was "someone who received the benefit but not the money," *In re Columbia Data Products, Inc.*, 892 F.2d at 29, and therefore was the "entity for whose benefit such transfer was made." §550(a)(1).  The University, however, was the initial transferee.

A discussion in *Bonded* directly applies to payments made after the refund period expires. There, debtor Bonded Financial Services sent a check to Ryan's bank payable to the order of the bank with instructions to deposit it into Ryan's account.  *Bonded*, 838 F.2d at 891.  Ten days later, on Ryan's instruction, the bank debited the account by the amount of the funds to reduce Ryan's loan.  The Seventh Circuit held that Ryan was the initial transferee because the instruction was simply to deposit the funds into Ryan's account, and the bank was a mere conduit because it "acted as a financial intermediary" and "received nothing . . . that it could call its own."  *Id*. at 891, 894.  When the bank later transferred the funds to itself to pay the loan, it was entitled to the good faith defense of §550(b).

As pertinent here, however, the court expressly recognized that:

If the note accompanying Bonded's check had said: "use this check to reduce Ryan's loan" instead of "deposit this check into [Ryan]'s account", §550(a)(1) would provide a ready answer.  The Bank would be the "initial transferee" and Ryan would be the "entity for whose benefit [the] transfer was made".

*Id*. at 892.  That is the case here.  Payments made after the refund period could only be used to pay the student's tuition, and neither the Debtor nor William had any ability to use them otherwise.  Payments made by the Debtor after the refund period are recoverable from the University.

The above conclusions apply as well to payments made through the Terp Payment Plan. Through the plan, tuition can be paid over time and the student is not assessed a late fee or suffers other consequences for not paying tuition in full at the beginning of the term.  The third-party administrator of the plan has no discretion and must forward the payments to the

14

University, after deducting its fee, regardless of what has happened to the student's account.  If any refund is due, the University pays it to the student, not through the plan.  The administrator of the Terp Payment Plan functions as the quintessential "mere conduit" for these purposes.

The University argues it would work a great injustice to William to allow the Trustee to recover the payments because William will become obligated to make good on them.  The Court is not unsympathetic to this point.  But as the Fourth Circuit has stated in a related context, "decisions as to who should bear the loss incurred by a post-petition transfer are made in the Code."  *Bowers I*, 99 F.3d at 157.  The rationale applies equally to pre-petition avoidance actions.

### Conclusion

For the foregoing reasons, the Court concludes that payments are not recoverable from the University to the extent the payments were refundable to William, but are recoverable to the extent the payments were made after the refund period expired.  Accordingly, the Court will grant in part and deny in part the parties' cross-motions for summary judgment on liability, and will enter an order providing the parties the opportunity to resolve between them the amounts in each category.  In the event an agreement is not reached, the Court will set the matter for further proceedings.

cc:    All parties
       All counsel


### End of Memorandum of Decision